We will proceed to the next case on the calendar, which is Dr. Pavel v. University of Oregon. I was going to mispronounce the name, so thank you. I wasn't going to try to pronounce the first name myself. Thank you, Your Honors. Mary Ann Dugan, representing the plaintiff appellant in this case, Dr. Pavel. As you know from the briefs, Dr. Pavel was the first tenured professor ever involuntarily terminated at the University of Oregon for any reason. At the time of his termination, Dr. Pavel was a full professor. He was the only Native American full professor, fully tenured professor at the U of O. And after he was accused of sexual harassment with no prior record of discipline and no prior complaints documented in his personnel file, he was terminated without ever seeing any of the evidence against him, not seeing any written allegations against him, and not being told he was going to be terminated until one working day before he was terminated. And because the university is a public body, this case raises issues of both procedural and substantive due process and First Amendment retaliation. And in addition, because there were similarly situated tenured professors who were not terminated, it raises issues of gender and race discrimination. Unless the court has a preference, I will start with the procedural due process argument. On summary judgment, the district court did find that Dr. Pavel had raised significant material issues of fact sufficient to go to a jury on procedural due process, but provided the defendants with qualified immunity, finding that the applicable law was not clearly established, and that was in error. The court itself cited a significant amount of prior precedent, which supported the district court's finding that there was sufficient evidence of insufficient due process. Can I ask this? Yes, you may. I guess I thought the district court, my inclination was to think the district court was right, because at least in the setting where you would have a fairly robust post-termination kind of due process type hearing, and here your client would have gotten that had the union gone forward with the arbitration, I thought in that context our cases, or the cases in particular of Loudermill from the Supreme Court, suggested that you could have a pretty informal pre-termination process, oral notification of the allegations and simply an opportunity to respond, and it seemed like your client was afforded that amount of process here. Well, I think given the unusual situation we're in with the union issue, and maybe I'll just jump to that for a second, it's a question of first impression in this circuit whether unionization of a public university can deprive a tenured professor of the significant due process and property interests that they have, or I should say diminish, because here, and I recognize that in Armstrong, this court held in 1992, that in general public employees post-deprivation due process rights can be basically substituted by a CBA, but here the Ninth Circuit has not addressed whether a professor who already had a significant, a very significant due process right as the Supreme Court held in Snowthour, sorry, Sloshour, that when Dr. Pavel was hired in 2010, there was no union. So at the time he was hired, he obtained very significant due process rights. Then the university unionized in 2013, and so the argument that the university is making is because of Armstrong that basically rolled back his rights, and this court, and I don't know if any court has addressed that in the context of a tenured professor. But can I just ask you to pause there, because we started out under the rubric of qualified immunity, and you yourself said this is kind of an issue of first impression. It seems to me what you would need to provide to us if we were going to overrule the district court on this point is some kind of clearly established law that said in this set of circumstances, you must do something different from what you did, and I just don't see that. That's why I started out by saying if you look at the existing landscape of law, I could see how the folks in the defendant's position would say, well, he's got this back-end procedure. We'll get to that if need be, but on the front end, this is all the law says we have to provide him, and we did. So what's wrong with that? Because Slowchower and the Orloff v. Cleland case from the Ninth Circuit came before Armstrong, my argument is that those cases clearly established that a tenured professor has significant due process rights that cannot be eroded, and Armstrong can't be read to have eroded that clearly established right. I realize I probably didn't make that argument as clearly as possible in the brief, but that's my argument. Well, let me ask you a second question, which kind of dovetails off this last one, Ms. Dugan. If I read Brewster, and this is the Board of Education v. Linwood Unified School District, there's one that's similar to what kind of a situation we face here, and even in Brewster, they say the law regarding procedural due process claims can rarely be considered clearly established, at least in the absence of closely corresponding factual and legal precedent. So I tried to come up with some case that was clearly on all fours with this case, and I couldn't come up with one. Well, I don't think Brewster says it has to be on all fours. Well, it says closely corresponding factual and legal precedent. Correct. So that says, you know, if you're going to be in the due process area, we're not going to have this be something where we're going to have clearly established law. So as Judge Watford has tried to question you, if you've got something where they do generally what they're supposed to do at the beginning, but they come forth with all this stuff at the end, and there's no clearly corresponding factual and legal precedent, then how can I suggest that they aren't entitled to qualified immunity? A couple of responses, Your Honor. I don't think they came in with any additional process at the end. Well, they tried, but the union said they didn't want it. The union chose not to arbitrate, but even post-deprivation, he was not even given the allegations against him in writing or the evidence. But I think— There's been a chance at arbitration post-termination, right? And the union was the one who said, we don't want to do it. Right, with no input from him, and I'm saying that Armstrong— But, frankly, you can't sue the university about what the union did. No, but we can sue for what was clearly established prior to the Armstrong decision, which is that under Slowchower, a tenured professor, and this is similar facts that there's a tenured professor who's being terminated and they have certain significant procedural due process rights. And when you combine that with the McCarthy-era Supreme Court case law regarding the right to cross-examine witnesses when you're a public employee who's being threatened with termination, that was clearly established prior. I've got to come up with three or four different ones which are not closely corresponding factual and legal precedent, and I've got to apply it here and say, no, they made a problem on qualified immunity or procedural due process. The Slowchower case is on point because it involves a tenured professor. Well, you'd have to say the Linwood Unified School District is also about tenured faculty, wouldn't you? Well, but they weren't addressing the issue that's before this court, which is— I understand it's not the same issue. I'm just trying to get what the law says I have to do here. Well, I think that— I'll take your answer. It's just I want your best because I think that's a problem you have. Well, I think cases like the Peters and Green from the Supreme Court in the McCarthy era set a floor for all public employees. Here we have a tenured professor who's at the apex of rights for a public employee. I can't think of anybody who's a public employee who has more rights, arguably, allegedly, than a tenured professor. And if this court allows a chipping away of what was clearly established in Slowchower and in the McCarthy era cases to say, oh, now that you got unionized after you were employed, you've lost some rights, that cannot stand, and that is not what was addressed in Armstrong. And here we have the Sixth Circuit in the light of the Me Too era saying that even students at universities have the right to cross-examine, and they've made that decision based on the McCarthy era case law and said that it's clearly established in the Sixth Circuit based on Supreme Court case law for a student. How could it not be clearly established that a tenured professor has the right to that sort of process? Even if cross-examination were not required, Dr. Pavel was never given a meaningful notice of the allegations nor a meaningful opportunity to respond as we fully briefed in the briefs. Well, just a minute. Wasn't he notified on November 18, 2014, what the allegations were and denied them? He was advised orally in a very tense meeting where he was not— these allegations were just thrown at him verbally. He was—the paper that was thrown at him was only the university's policies. He was never— Well, I understand, but I'm just trying to understand the facts. Then he had another hearing on January the 6th, 2015. That was not a hearing. Well, he had another presentation. Let's not call it a hearing. Call it what you want. I only wrote down a hearing only because that's what it seemed to me. And he could have presented additional evidence there. He presented nothing. He was told at the January meeting, you're being terminated one working day from now. He was not given an opportunity to review any evidence. He was not given actual full notice of what the charges were at any time. The investigation was biased from the beginning and prejudiced against him, as we explained in the briefs. But he was given an opportunity after he was informed he would be terminated. He was given an opportunity to respond, correct? He was told he could submit a response in writing. At the November—or, sorry, December meeting, he was told, yes, you have the right to see the allegations in writing. We'll give them to you. The meeting ended. They then got back to him and said, no, we're not giving you the allegations in writing. He never saw any evidence against him. He had no meaningful opportunity to respond. Wait, I thought he did see— there was a document that was handed to him that included why he was being terminated that said it was for unwelcome touching of a student's back, buttocks, and underwear, unwelcome kissing of a student on the hand, cheek, and forehead, inappropriate comments of a sexual nature to a student, including inquiring whether the student was in a relationship and remarking on the student's appearance after having her stand in front of a mirror. Was that not given to him? It certainly wasn't given to him at the December meeting. And it was given at January 6th meeting. Which was not a hearing. It was a statement that you're being terminated on Tuesday, which was the day after Martin Luther King Day, and he was told it's on a Friday. So if he was—and I don't remember him being given any document until after he was terminated, but if he was— No, he was told he would be terminated, effective January 21st, and he was given this information, and he was told he had an opportunity to respond no later than January 20th. So my question is, did he respond to that? You suggested that he had no basis to even understand what was going on here. I don't know what was said in the face-to-face meetings, but we have at least a written record that he was informed what the findings were. On January 16th, the Friday before the Tuesday after the holiday. Okay. But he was told he could respond by— you're saying he didn't need to spend Martin Luther King holiday responding to these claims of sexual harassment? These are pretty serious claims, it seems to me. Certainly. And he did respond orally in the December meeting, which was the only actual meeting. Yeah, but he was given this in—I'm looking for the date. It's January 16th. I think you're right. It was January 16th. So he was given this on January 16th, a written letter, told he had— I mean, it doesn't seem like this is—did he deny it? Did he write a letter? I mean, if I was accused of this, I would have—and I was given an opportunity to respond, I would have written a letter and said I didn't do it. I don't see that in the record. He was continuously denying what he was being accused of, which he had up until that date been told verbally. And the courts have been clear that for a meaningful opportunity to respond, there is a timing factor, which is— there was one case that said three working days was not sufficient, and this was one working day. And there was no prior notice to the entire faculty as tenured professors that one allegation of sexual harassment could lead to immediate termination. Well, wait. Back up. This was not the first allegation of sexual harassment. It was the first documented allegation. There is no allegation in his personnel file. He was never told he was being disciplined prior to that. There was nothing in writing. But let's be clear. You may be right about that, but your statement was the first allegation of sexual harassment, and that is not accurate based on the record. The first documented allegation. The first allegation documented in his file. Okay. I apologize for overstating that, Your Honor. I see I have just a few seconds, so I— Your time is actually up, but we will give you time to respond. Thank you, Your Honor. Let's hear from counsel for the defendants now. Good morning, Your Honor. Amanda Walkup here on behalf of the defendants at Belize. I'd like to respond to a few points that you raised with opposing counsel, if that's okay, first. As to what was said in the face-to-face meeting, that's actually in the record under CR 64, and that occurred on December 18, 2014. And what's in the record under CR 64 are handwritten notes and then a summarized version of those notes created by plaintiff's union representative who attended that meeting with plaintiff when he was meeting with university representatives. The reason for that meeting was actually part of the investigation where the university was meeting with plaintiff and his union representative and walking through the allegations that were made by the female student and getting his version of events. So those notes are very helpful, I think, in identifying what was said during that meeting and getting a good idea of the detail in which the university went through all of the allegations raised by the female student. The second thing I'd like to go to is agreeing with the Court's comments that Brewster does control in this case related to qualified immunity. Plaintiff has not provided any other cases that closely correspond to the facts here. What I'd like to do is just quickly walk through the math use factors that do apply here to highlight the fact, first of all, that this is a fairly unique case. There are a lot of robust or flexible factors going on that are specific to the university that make it very difficult, in fact, to find closely corresponding facts. So the first factor is the burden on the employee, which we can all agree is significant. When you terminate an employee, it does weigh in favor of procedural safeguards. But the third factor, which relates to the university's interest, this is actually very important in this case. It includes consideration of the university's function and its fiscal and administrative burdens. So here what you have is the university gets a complaint from a first-term freshman female that she has been victimized by a tenured faculty member. She's had to subject herself to unwanted sexual conduct. So what the university does is respond to that, obviously. One of the highest priorities for the university is student safety and welfare and also providing equal access to their students. The university is required to comply with the requirements under Title IX. Here, plaintiff's conduct interfered with the student's right to equal access. It's undisputed in the record that this female student did change her course of education because of his behavior. Maybe you could go ahead. I was just going to interrupt the flow of your argument, but there is some suggestion that the people doing the initial investigation might have been biased from the outset. I just wondered if you could speak to that. Sure. There's a couple of points to that. First of all, what the evidence in the record is is that plaintiff's union representative compared her interactions with the HR folks related to this complaint as to her interactions with other union members who are being disciplined or being investigated. And her statement was they actually treated him the same. So keep in mind here, for purposes of at least for the race and gender discrimination, there needs to be some discriminatory animus. But as to the due process piece. I was speaking just trying to. You presented a very sort of benign summary of the university had this interest in getting to the bottom of things and wanted to conduct a thorough and fair investigation. And I'm just saying there were suggestions in the record that at least the people on the front line, I don't know what the right characterization is, but they were, you know, they had it in for him and they kind of communicated that we're going to, I don't know, and we're going to be sure to find more of these or something like that. But it was something that suggested that they had already prejudged the outcome of what this investigation was supposed to be. That's all I was wanting you to respond to. Fair enough. So in responding to your question, under Clemens v. Airport Authority, what that case does, that is an employment case and it has a pre-termination, post-termination evaluation. And what it decides is that if there is a robust post-termination process available, then the unbiased or impartiality on the pre-termination process is not nearly as important. And it's because, again, back to the check and balance, under Loudermill, when you have the robust post-termination process available to you, the pre-termination is more of a check, an immediate check, rather than the entire due process piece all at once. And because you have that two-step process and the post-termination, and particularly here because under the collective bargaining agreement, the way the parties were to select their arbitrator, it was based off of a mutual selection of arbitrators. So it's an outside party. It's not even in an internal panel of universal employees. There's an absolute opportunity during the post-termination process to have an unbiased arbitrator available. Okay. So I actually thought you were going to try to defend the unbiased nature of the pre-termination investigation, but you're saying that actually the record does support the view that — Well, I mean, we dispute the facts, but there is some evidence in the record, and because it's a summary judgment motion, the inference goes to the non-moving party. Fair enough. So I don't agree with it, but in the spirit of this analysis. Got it. So — If we move to the substantive due process claim, the plaintiff has to prove or he must claim he claims he's not able to pursue the occupation of his choice. He must show a defamatory statement. He must show it affected his future employment opportunities. We're on summary judgment. His declaration says he works in a specialized field. It's impossible for him to find another job in his chosen field as a professor. He has not applied for jobs in his field because no jobs are available. He had grants, and he lost them all. He had speaking assignments. He lost them all. He had a position as an external evaluator, but now has one in that field. Now, why is that not enough to at least overcome summary judgment? Well, first I'll start with qualified immunity, and then I can go back to the substantive claim. But the qualified immunity, the reason why the individual defendants are entitled to that, is because it's unsettled law in the Ninth Circuit, whether or not under this substantive due process analysis of stigma and plus, whether or not the person committing the stigma act and the person committing the plus act have to be the same actors. And in this case, it's undisputed that they were different parties. And, in fact, the person who publicized or didn't publicize it, the person who released the police report, which was then subsequently publicized via a newspaper article, that individual that released the police report was a university employee who has not been named in this case and was doing so pursuant to a public records request. So as to the stigma plus, right off the bat, because we don't have the same actors aligned, all of the individual defendants would be entitled to qualified immunity. But then you go further, and you talk about has plaintiff proven the merits of the substantive due process claim? No, he hasn't. Because under Inquist, where that situation, also an individual who was employed in a very specialized area, she testified that she had applied for over 200 jobs and couldn't get a position. And what that court found was there's no causal link. She couldn't prove the causal link between the stigmatized behavior and the fact she couldn't find a job. Same analysis here. Even if there was stigmatizing, which, of course, we do not concede, but even if there was, he has the burden to prove in his prima facie case that somehow the individual defendant's behavior caused him to not get a job, and he hasn't proven that. Because what? Because that's what I was going to say. Why not? Well, I don't know. I mean, we've got an affidavit, and I've read you what it says. That seems to be more than adequate. No, what we have is an opinion of peace. What we don't have is actually he needs to prove with admissible evidence as to why people... But that's an opinion. That's his opinion. But as to whether or not, you know, why are there no jobs available? Why? Because what he testified was there was no job that was available for him to apply to. So we don't know. The record has no information as to why there are no jobs he could apply for. For example, he hasn't said that he's not qualified for jobs that are available. The record has no information, and that's the plaintiff's burden. But regardless, the parties are still entitled to qualified immunity on the substantive due process piece. I was just going to ask, I mean, is it your view of what our cases say that a plaintiff and the plaintiff's situation here has to come forward and say, I applied for this specific job, and they told me the reason I didn't get it was because they had heard from the defendants X, Y, and Z? There needs to be some evidence in the record of causation, and I think Inquist goes through that and says that the mere fact you have Step 1 and Step 3, you need to have some causal link in between. Well, all you're saying is that unless there's a government blacklist, that's all you can have? Is that what you're saying? No, I think that's the standard. The courts have stated that it's not merely significant that even if there was a… Even on summary judgment, the only way to survive summary judgment is if the University of Oregon blacklisted this guy? Well, there needs to be something similar to that, because as Inquist goes through, the mere fact that you've been stigmatized is not sufficient. Instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find a new employment in his chosen field. Well, that's why I gave you the declaration. It seemed to me that's trying to set that up pretty much just exactly where you're going. I mean, he says it's impossible to find another job in his chosen field. He's not applied for jobs in his field because there's no jobs available. He has grants. He's lost them. He had speaking engagements. He lost them. He had a position as an external auditor, and that's the only thing he can do now. Well, again, I respectfully disagree that there's information in the record, but I do come back to the fact that the parties, the individual defendants, would still be entitled to qualified immunity. And the other piece to that is, remember, there's three individual defendants, and there's nothing in the record to show that any of the individual defendants had anything to do with the release of the police report, and there's only one individual defendant that made the decision to terminate his employment. So that's the other thing is keeping in mind we have multiple parties in play here and each of their liabilities need to be evaluated separately. And if we go to race and gender claims, it seems to me, using McDonnell Douglas, no one disputes that he belongs to the protected class. No one disputes he was performing according to the employer's legitimate expectations. No one disputes he suffered an adverse employment action. And now we're just about whether similarly situated employees were treated fairly. Would you agree with that? That's the only issue in front of us? No, there was one additional fact that plaintiff did not rebut, and that is plaintiff did not rebut university's legitimate nondiscriminatory reasons. Well, that's the second part. Fair enough, yes. So if we're on the first stage of the burden shifting, yes, I agree that we're talking about similar things. Well, I guess then we've got the comparisons that can be drawn. It seems to me they may not be exact good comparisons, but then I don't know why we wouldn't get there. So we come to the university's part. I understand now you're making a good argument about what the university said, but now we're on pretext. I'm trying to figure out, you're saying there's no evidence of pretext? Well, first I'm not conceding that they made it through the prima facie case, and it's because they have not shown that there are any similarly situated faculty members who were treated more favorably than plaintiff. Well, what about Professor Fyfe? Right. So, of course, first it's our position, and we made this in the trial court, that there are no similarly situated individuals. Well, that's why I went through. Why not Professor Fyfe? Professor Fyfe, because Professor He was scheduled for termination. He was. He just did. He was. And so I don't understand why that's not the same. He quit. Is that why it's not the same? No, that's not why it's not the same. He's not the same because plaintiff in this case had been counseled on the very, very similar, if not exact same behavior two years prior to the event in 2014, and Professor Fyfe did not have that prior history. So for that reason, there's a distinction. But even if you wanted to go and say that Professor Fyfe was a comparator, which is what the trial court did, what you find there is they were treated the same, and it's because the university decided to terminate unless either of them, and separately, but each of these professors were given the opportunity to provide some extenuating circumstances to why they should not be terminated. That process was treated the same. The difference was Professor Fyfe raised his hand and said, wait a minute, I want to resign. So he resigns. Plaintiff doesn't do that. So that's not on the university. The university treated the two the same. It's the way they reacted that is different, and that cannot be part of the test as to whether or not the university treated them the same. So for that reason, plaintiff does not survive, does not prove a prima facie case. And then, of course, the university does present a legitimate nondiscriminatory reason, and then you come back to pretext, and plaintiff has provided no additional information and is relying solely on the prima facie, which has already failed. So for that reason, both the race and gender claims should be dismissed. And, in fact, what we just talked about was race. There's really nothing in the claim about a case about gender. So that claim should be dismissed as well. Do you have any other questions? It does not. Thank you very much. All right. Let's give you two minutes for rebuttal.  The comparator number five was given the opportunity to resign, and Professor Pavel was not. That alone is a difference, a significant difference. But the other comparators were substantially similar, but that should be an issue of fact. You assert that he wasn't given the opportunity to resign. How do we know that? In his declaration, he says they never said, you can resign. So he wasn't told he could resign. Whether he could have said, let me resign, again, we have a timing issue, which I think should go to a jury as to whether somebody in this, given this very strange information that he's going to be terminated when he's a tenured professor and there's never been a tenured professor at the U of O ever fired for any reason. He's told on a Friday that, oh, we're going to fire you on Tuesday after MLK Day. You can, you know, think about it. And then he's supposed to all of a sudden say, well, maybe I'll resign without even having the opportunity to sit down and think about it. That should be a jury question. I think the Inquis case certainly doesn't say that you can't use circumstantial evidence of timing and severity regarding your working full time as a tenured professor. You get fired and smeared in the media and social media, and now you can't find any work and all of your contracts are terminated. That's certainly circumstantial evidence sufficient to support a jury verdict in favor of a plaintiff on substantial due process claim. What are you going to do with her qualified immunity argument? I mean, that was the one that I couldn't get around, and so she asserted again today. Are you talking about the substantive? About the stigma plus due process, yes. Well, I don't think Inquis says that you have qualified immunity. I think that I see I'm out of time. May I finish answering your question? Of course. Thank you. That causal link issue is not an issue that would support qualified immunity. Qualified immunity goes to the question of whether the actor's behavior violated the plaintiff's rights. This issue of a causal link regarding the damages that ensued is not a proper subject of qualified immunity, but even if it were, certainly all of the prior case law about stigma plus would support this going to a jury on the factual issue. When the stigma and the plus were committed by different government actors? Oh, that issue. I'm sorry. Yes, Your Honor. That issue, that is an issue of first impression in the Ninth Circuit. And so, therefore, if first impression, qualified immunity is a good place. No. Actually, this Court's prior precedents in Rivero and Inouye do not require prior Ninth Circuit precedent on that issue, and a circuit split does not prevent an issue from being clearly established, and it was clearly established in the bulk of the case law that it doesn't have to be the same actor. But here, it is the same actor because it's a university that did both acts. It doesn't matter which individual did it. It was an official act. Thank you, Your Honors. Okay. Thank you very much. The case just argued is submitted.
judges: N.R. Smith, Watford, R. Nelson